# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA          **CRIMINAL COMPLAINT**

vs.                               Case No. 3:19-mj- 1256-MCR

RICHARD RONNIE JENKINS

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From on or about July 14, 2019, through on or about July 16, 2019, in the Middle District of Florida, and elsewhere, the defendant,

> transported an individual, that is, N.J., in interstate commerce with the intent that N.J. engage in prostitution or any sexual activity for which any person can be charged with a criminal offense,

in violation of Title 18, United States Code, Section 2421. I further state that I am a Task Force Officer of the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

_____
Signature of Complainant
Chris Sullivan

Sworn to before me and subscribed in my presence,

on July 18, 2019          at     Jacksonville, Florida

MONTE C. RICHARDSON
United States Magistrate Judge          _____
Name & Title of Judicial Officer         Signature of Judicial Officer

## AFFIDAVIT

I, Chris Sullivan, being a duly sworn, depose and state that:

## IDENTITY OF AFFIANT

1. I am a Special Deputy U.S. Marshal (task force officer) assigned to the Federal Bureau of Investigation (FBI) Jacksonville Child Exploitation and Human Trafficking Task Force. I have been employed with the Jacksonville Sheriff's Office (JSO) since 1995. Before being assigned to investigate human trafficking in September of 2016, I was assigned to the Vice/Narcotics Unit for approximately 13 years. I have training and experience in the preparation, presentation, and service of criminal warrants and training and experience in the service of arrest warrants.

2. Based on my training and experience as a Detective with JSO, I have participated in investigations involving human trafficking and the unlawful possession, sale, or trafficking of narcotics. In some of these investigations, I have been the case agent, while in others I have acted in an undercover capacity dealing directly with the targets of the investigation.

3. The information contained in this affidavit is based upon information provided to me by N.J., the victim in this case, Richard Ronnie JENKINS, the subject of the investigation, my review of cell phone contents of N.J. obtained during this investigation, and other documents and evidence that have been collected as part of this investigation. The information provided in this affidavit does not include each and every fact known to me, but rather, information sufficient to establish probable cause for the requested criminal complaint.

## REQUESTED CRIMINAL COMPLAINT

4. Based on the information in this affidavit, I request that a criminal complaint be issued for Richard Ronnie JENKINS for violating the provisions of Title 18, United States Code, Section 2421.

## FEDERAL LAW

5. I am familiar with federal law including Title 18, United States Code, Section 2421, which prohibits the transportation of any individual in interstate commerce with the intent that they engage in prostitution or any sexual activity for which any person can be charged with a criminal offense.

## INVESTIGATIVE ACTIVITY

6. On July 16, 2019, the JSO Integrity Unit was notified by JSO patrol of a human trafficking investigation. Patrol transported N.J. and JENKINS to the Integrity Office to be interviewed. On the same day and the following day, I and Detective J. Maynard spoke to N.J. regarding the investigation.

7. N.J. advised that she is from Fayetteville, North Carolina, and posted an ad on the internet site "skipthegames," which is known for hosting advertisements for prostitution. On July 14, 2019, JENKINS responded to the ad and drove to an agreed upon location to pick N.J. up. The agreement was for JENKINS to pay N.J. $160 for a "car date." N.J. stated that prior to JENKINS responding to her ad, N.J. did not know JENKINS.

8. JENKINS told N.J. that if she was really interested in making money, he could take her back to Jacksonville, Florida, and she could make a lot of money on the internet. N.J. agreed to go with JENKINS. JENKINS drove N.J. to an area in

Fayetteville, North Carolina, that was in the vicinity of a home belonging to a friend or family member of JENKINS. N.J. stated that, at that point, JENKINS had sexual intercourse with her and did not pay her. N.J. stated that she informed JENKINS she did not want to have sex with him without a condom, but ultimately relented. N.J. stated that JENKINS then retrieved his teenaged child from a residence, and then JENKINS drove N.J. and his child from Fayetteville, North Carolina, to Jacksonville, Florida.

9. While driving to Florida, JENKINS told N.J. to post another ad on "skipthegames" using a new "textnow" phone number with a Jacksonville area code. Based on my training and experience, "textnow" is a mobile phone application that allows for communications to a phone through a phone number other than the carrier-assigned number for the phone. I have reviewed the ad that N.J. stated she had posted at this time, which makes references to prostitution, with the title reading, "Slippery, Pink, TIGHT + CREAMY - INCALL ONLY MiXeD HORNY." N.J. stated that during the drive to Jacksonville, N.J. was receiving calls from an ex-boyfriend and, in response, JENKINS threatened to send people to his location in North Carolina if she told him who she was with and where she was located.

10. N.J. stated that immediately upon arrival to Jacksonville, Florida, JENKINS checked them into the Ramada Inn located at 3130 Hartley Road, Jacksonville, Florida, at approximately 10:00 a.m. on July 15, 2019. JENKINS told N.J. that she was not going to get any of the money for the "dates" he was arranging. JENKINS told N.J. she needed to make $1200 and she couldn't go home until she made that money. While at the Ramada Inn, JENKINS logged into N.J.'s "textnow" account and was able to conduct the conversations with the "johns" (potential customers for commercial sex dates) who

responded to the ad that had been posted on "skipthegames". JENKINS, pretending to be N.J., arranged "dates" and directed the "johns" to the hotel room at the Ramada Inn where N.J. was located.

11. N.J. advised that on July 15, 2019, JENKINS arranged three (3) dates for her and each date was for $160 for sex. N.J. advised that on July 16, 2019, JENKINS arranged one (1) date for her that was for $160 for sex, however, the "john" only brought $140. N.J. did not receive any of the money paid for the dates. N.J. stated that JENKINS would supervise the dates from the hotel parking lot, and, after the dates, JENKINS would come to the room and collect all of the money.

12. JENKINS told N.J. that if she told anybody or contacted the police he would hurt her. I am aware that JENKINS has a physical disability and uses a cane and walker at times. N.J. stated that, at one point, JENKINS threatened her and stated not to let the cane or walker "fool you."

13. On July 16, 2019, JENKINS advised N.J. he was paying to have her hair done and drove her to The African Braiding Shop, which is located at 7915 103rd Street, Jacksonville, Florida. JENKINS left N.J. unattended in the hair shop. N.J. stated that during this time, she contacted her cousin, located outside the State of Florida, and told her cousin that she had done something stupid and was in Florida with a pimp. Ultimately, N.J.'s family members were able to get in contact with JSO, and a patrol officer responded to the African Braiding Shop. JENKINS later returned to the African Braiding Shop and was taken into custody by patrol.

14. N.J. provided written consent to search her phone. I have reviewed the contents of N.J.'s phone, including the following text communications sent and received on

July 15, 2019, between N.J. and JENKINS, who was using the phone number 904-312-4110 (as described below, when interviewed, JENKINS confirmed that this was his phone number):

| | |
|---|---|
| JENKINS: | Let me know you are safe |
| | Keep track of time |
| N.J.: | I will set me timer |
| | Done |
| JENKINS: | Wash up and come outside. I'm waiting |
| | He just left |
| N.J.: | Yeah |
| JENKINS: | Call that number you just missed |
| N.J.: | I just texted that person look at it before you say something lol |
| | Ima let you know when I'm done |
| JENKINS: | K |
| | What happened |
| N.J.: | He got $45 lost $10 want oral |
| | Should I take him? |
| JENKINS: | He's leaving |
| | Yes |
| N.J.: | Ok |
| JENKINS: | Yo |
| N.J.: | Yeah |
| JENKINS: | He is there? |

5

| | |
|---|---|
| N.J.: | No he procrastinating on whether to come of not |
| JENKINS: | Tell him forget it |
| JENKINS: | Let me know you are safe |
| | You good???? |
| N.J.: | YeH |

15. I also reviewed the following text conversation from July 16, 2019, between JENKINS and N.J., contained on N.J.'s phone:

| | |
|---|---|
| JENKINS: | How did he know which room? |
| | I didn't tell him |
| | Did you speak to him? |
| | Think he saw me |
| N.J.: | Idk I said is he here I was asking |
| JENKINS: | Call the guy |
| N.J.: | Ok |
| | No answer |
| JENKINS: | Yuh good? |
| | Yo |
| | Listen, after this I'm going to send you back because I don't want you uncomfortable |
| | I don't get it |

16. The text messages between N.J. and JENKINS also include nude pictures of N.J. that were used in the "skipthegames" ads.

17. After he was arrested on July 16, 2019, I read JENKINS his United States Constitutional Rights via form. JENKINS agreed to answer questions without a lawyer

6

present. I and Sergeant W. Nelson proceeded to interview JENKINS. JENKINS stated that he has had his phone for a while and the number is 904-312-4110. It should be noted that the number JENKINS provided is the same number that was used to text N.J. in the above conversation.

18. JENKINS corroborated information provided by N.J. by admitting he responded to a "skipthegames" ad in Fayetteville, North Carolina. JENKINS advised he "fucked" N.J. and offered to take her to Jacksonville Florida. JENKINS said he never paid N.J. for sex. JENKINS admitted that he drove N.J. from North Carolina to Florida and stopped occasionally at rest stops. JENKINS admitted to checking into the Ramada Inn with N.J. JENKINS admitted to taking N.J. to get her hair done. When asked about ads posted in Florida, JENKINS denied knowledge, stating, "I don't know nothing about that" and stated "I'm not a pimp." JENKINS then invoked his rights and the interview was concluded.

## CONCLUSION

19. Based on the foregoing facts, I submit that there is probable cause to believe that from on or about July 14, 2019, through July 16, 2019, Richard Ronnie JENKINS transported an individual, that is N.J., in interstate commerce with the intent that N.J.

engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, in violation of Title 18, United States Code, Section 2421.

This concludes my affidavit.

Respectfully submitted,

_____
Detective Chris Sullivan
FBI Task Force Officer

Subscribed and sworn to before me
On July 18, 2019:

_____
MONTE C. RICHARDSON
United States Magistrate Judge

8